FILED
CLERK, U.S. DISTRICT COURT

DEC 14 2017

CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2017 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 17- |
| Plaintiff, | **17CR00774**<br>I N D I C T M E N T |
| v. | |
| TAMARA YVONNE MOTLEY,<br>  aka "Tamara Ogembe,"<br>  aka "Tamara Motley-Ogembe,"<br>CYNTHIA KARINA MARQUEZ, and<br>JUAN ROBERTO MURILLO, | [18 U.S.C. § 1347: Health Care<br>Fraud; 18 U.S.C. § 1028A(a)(1):<br>Aggravated Identity Theft; 18<br>U.S.C. § 1956(h): Conspiracy to<br>Launder Monetary Instruments; 31<br>U.S.C. §§ 5324(a)(3), (d)(2):<br>Structuring of Currency |
| Defendants. | Transactions to Evade Reporting<br>Requirements; 18 U.S.C. § 2:<br>Aiding and Abetting and Causing an<br>Act to be Done] |

The Grand Jury charges:

COUNTS ONE THROUGH TWENTY

[18 U.S.C. § 1347]

A.  INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

The Durable Medical Equipment Companies

1.  From in or about July 2006 to in or about August 2014,

defendant TAMARA YVONNE MOTLEY, also known as ("aka") "Tamara

Ogembe," aka "Tamara Motley-Ogembe" ("MOTLEY"), operated Action

Medical Equipment and Supplies, Inc., aka Action Medical Equipment and Supply, Inc. ("Action"), a durable medical equipment ("DME") supply company located at 11801 Inglewood Avenue, Suite 3, Hawthorne, California 90250, within the Central District of California. Although Action was purportedly owned by B.M. and was enrolled with the Medicare Program ("Medicare") as a provider using the name B.M., defendant MOTLEY controlled Action's operation and received the vast majority of revenue generated by Action.  Defendant MOTLEY was a signatory on two bank accounts associated with Action.

2.   From in or about January 2013 to at least in or about November 2016, defendant MOTLEY operated Kaja Medical Equipment & Supply, Inc., aka Kaja Medical Equipment and Supplies ("Kaja"), a DME supply company located at 1416 East Main Street, Ventura, California 93001, within the Central District of California.  Although Kaja was purportedly owned by B.B. and was enrolled with Medicare as a provider using the name B.B., defendant MOTLEY controlled Kaja's operation and received the vast majority of revenue generated by Kaja.  Defendant MOTLEY was a signatory on three bank accounts associated with Kaja.

3.   From in or about 2008 to at least in or about August 2014, defendant CYNTHIA KARINA MARQUEZ ("MARQUEZ") was employed at Action as an office employee and later as office manager.  From in or about July 2013 to in or about May 2016, defendant MARQUEZ also worked for Kaja and provided directions to Kaja employees on behalf of defendant MOTLEY.

4.   Between in or about December 2010 and in or about December 2015, defendant JUAN ROBERTO MURILLO ("MURILLO") worked for Action and, later, Kaja as a repair technician.

5.    Between in or about November 2006 and in or about August 2014, Action billed Medicare approximately $18,254,694.21 for DME, such as power wheelchairs ("PWC" or "PWCs"), PWC-related accessories, knee braces, or back braces, the repair or replacement of PWCs and PWC parts, and other services.  Medicare paid Action approximately $10,294,122.56 for those claims.

6.    Between in or about July 2013 and in or about November 2016, Kaja billed Medicare $6,355,809 for PWCs, PWC-related accessories, the repair or replacement of PWCs and PWC parts, and other services.  Medicare paid Kaja approximately $2,803,114.59 for those claims.

### The Medicare Program

7.    Medicare was a federal health care benefit program, affecting commerce, which provided benefits to individuals who were over the age of 65 or disabled.

8.    Individuals who qualified for Medicare benefits were referred to as "beneficiaries."  Each Medicare beneficiary was given a Health Identification Card containing a unique identification number ("HICN").

9.    DME supply companies, physicians and other health care providers that provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."

10.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").  CMS contracted with private contractors to: (a) certify DME providers for participation in Medicare and monitor their compliance with Medicare standards;

1  (b) process and pay claims; and (c) perform program safeguard

2  functions, such as identifying and reviewing suspect claims.

3      11.   To obtain payments from Medicare as reimbursement for

4  services provided to Medicare beneficiaries, a provider first had to

5  apply for and obtain a Medicare provider number.  By signing the

6  Medicare provider application, the provider agreed to (a) abide by

7  Medicare rules and regulations; and (b) not submit claims for payment

8  to Medicare knowing they were false or fraudulent or with deliberate

9  ignorance or reckless disregard of their truth or falsity.

10     12.   If Medicare approved a provider's application, Medicare

11 assigned the provider a provider number, which enabled the provider

12 to submit claims to Medicare for services and supplies provided to

13 Medicare beneficiaries.

14     13.   To obtain and maintain their Medicare provider numbers and

15 billing privileges, DME providers had to meet the standards for

16 participation for Medicare, including the requirement that the DME

17 provider agree not to make a direct solicitation of a beneficiary

18 (unless certain exceptions applied).

19     14.   Most Medicare providers, including Action and Kaja,

20 submitted their claims electronically pursuant to an agreement with

21 Medicare that they would submit claims that were accurate, complete,

22 and truthful.

23     15.   Medicare paid DME providers only for DME that was medically

24 necessary to the treatment of a beneficiary's illness or injury, was

25 prescribed by a beneficiary's physician, and was provided in

26 accordance with Medicare regulations and guidelines that governed

27 whether a particular item or service would be paid by Medicare.

28

16.   Under certain circumstances, Medicare paid for repairs, maintenance, and replacement of medically required DME, including PWCs.   Medicare only paid DME providers for repairs if the repairs were needed to make the DME serviceable, the DME was still medically necessary to the treatment of a beneficiary's illness or injury at the time of the repairs, and the repairs were provided in accordance with Medicare regulations and guidelines.

17.   Medicare required a claim for payment to set forth, among other things, the beneficiary's name and HICN, the type of DME provided to the beneficiary or the type of DME repair that was performed, the date the DME was provided or the repair was performed, and the name and unique identification number ("UPIN") or National Provider Identifier ("NPI") of the physician who prescribed or ordered the DME.

18.   From in or about July 2006 to in or about November 2016, Medicare reimbursed providers 80% of the allowed amount of a PWC claim or PWC repair claim, and the beneficiary was ordinarily obligated to pay the remaining 20%.

19.   From in or about July 2006 to in or about December 2010, Medicare would often make lump sum payments to the providers as reimbursement for PWCs provided to beneficiaries.   Effective January 2011, however, Medicare no longer reimbursed providers for lump sum purchase payments for standard PWCs and instead required that standard PWCs be provided to beneficiaries on a monthly rental basis. The Medicare reimbursement for standard PWCs provided on a monthly rental basis was substantially less than the lump sum payments that providers could receive for standard PWC claims prior to January 2011.

B.    **THE SCHEME TO DEFRAUD**

20.    Beginning in or about July 2006, and continuing until in or about November 2016, in Los Angeles and Ventura Counties, within the Central District of California, and elsewhere, defendants MOTLEY, MARQUEZ, and MURILLO, together with others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed a scheme and artifice: (a) to defraud Medicare as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from Medicare by means of material false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

C.    **THE FRAUDULENT SCHEME**

21.    The fraudulent scheme operated, in substance, in the following manner:

a.    Defendant MOTLEY paid co-schemer individuals known as "marketers" to recruit beneficiaries to visit certain referring physicians, who would then prescribe medically unnecessary DME, including PWCs and orthotics, such as knee and back braces, for the beneficiaries.

b.    The marketers would offer the recruited beneficiaries "free" DME items, including PWCs, in exchange for the use of their Medicare identification numbers.

c.    Defendant MOTLEY, or other co-schemers acting at the direction of defendant MOTLEY, would personally pick-up DME prescriptions from the referring physicians or pay the marketers for DME prescriptions.

d.    As defendants MOTLEY and MARQUEZ well knew would happen and intended to happen, Action would submit claims to Medicare for DME, including PWCs and orthotics, such as knee and back braces, even though, as defendants MOTLEY and MARQUEZ then well knew, the DME was not medically necessary and did not otherwise meet the reimbursement requirements of Medicare.

e.    After Medicare stopped reimbursing providers for lump sum purchase payments for standard PWCs, at the direction of defendants MOTLEY and MARQUEZ, Action largely stopped billing Medicare for PWCs and instead started billing Medicare for unnecessary PWC repair and replacement services.

f.    At the direction of defendants MOTLEY and MARQUEZ, Action employees would recruit beneficiaries who were previously supplied with a PWC (including beneficiaries who had previously been supplied a PWC by Action) to receive unnecessary PWC repair or replacement services.

g.    At the direction of defendants MOTLEY and MARQUEZ, Kaja employees would also recruit beneficiaries who were previously supplied with a PWC (including beneficiaries who had previously been supplied a PWC by Action) or beneficiaries who previously received PWC repair or replacement services (including services from Action) to receive unnecessary PWC repair or replacement services.

h.    As part of this recruitment, at the direction of defendants MOTLEY and MARQUEZ, Action or Kaja employees would often cold-call the Medicare beneficiaries and tell them that either Action or Kaja was scheduled to conduct free repairs or maintenance of the beneficiaries' PWCs.

         i.    At the direction of defendants MOTLEY and MARQUEZ,
defendant MURILLO and other Action or Kaja employees would travel to
the homes of Medicare beneficiaries, many of whom lived over 100
miles away from Action or Kaja, and would typically stay 30 minutes
or less and only replace the PWC battery, even if the replacement was
not necessary at the time or the PWC was no longer medically
necessary.

         j.    At the direction of defendants MOTLEY and MARQUEZ,
defendant MURILLO and other Action or Kaja employees would sign
documents and have the beneficiaries sign documents falsely stating
that additional PWC repair and replacement services, including
repairs and replacements of joysticks, controllers, motors, tires,
and seat lift mechanisms, were performed, even though, as defendants
MOTLEY, MARQUEZ, and MURILLO then well knew, the additional PWC
repair and replacement services were never performed and were not
necessary to make the PWCs serviceable.

         k.    As defendants MOTLEY, MARQUEZ, and MURILLO then well
knew would happen and intended to happen, Action and Kaja would
submit false and fraudulent claims to Medicare for those PWC repair
and replacement services, even though, as defendants MOTLEY, MARQUEZ,
and MURILLO then well knew, the PWCs were not medically necessary,
the PWC repair and replacement services were not needed to make the
PWCs serviceable, and the PWC repair and replacement services were
often never provided or performed.

         22.   Between in or about November 2006 and in or about August
2014, Action billed Medicare and was paid by Medicare as described in
paragraph 5 of this Indictment.

23.   Between in or about July 2013 and in or about November 2016, Kaja billed Medicare and was paid by Medicare as described in paragraph 6 of this Indictment.

D.   **EXECUTIONS OF THE FRAUDULENT SCHEME**

24.   On or about the dates set forth below, within the Central District of California, and elsewhere, defendants MOTLEY, MARQUEZ, and MURILLO, together with others known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute the fraudulent scheme described above, by submitting and causing to be submitted to Medicare the following false and fraudulent claims:

| COUNT | APPROX. DATE CLAIM SUBMITTED | BENEFICIARY | APPROX. AMOUNT BILLED | CLAIM NO. | DME COMPANY |
|---|---|---|---|---|---|
| ONE | 2/20/2013 | M.R. | $3,940 | 113051850135000 | Action |
| TWO | 3/7/2013 | M.V. | $3,970 | 113066848663000 | Action |
| THREE | 10/25/2013 | M.F. | $3,340 | 113298843738000 | Action |
| FOUR | 12/4/2013 | R.B. | $3,315 | 113338849096000 | Action |
| FIVE | 12/31/2013 | J.G.E. | $3,315 | 113365855286000 | Action |
| SIX | 1/2/2014 | J.C. | $3,315 | 114002855266000 | Action |
| SEVEN | 3/27/2014 | G.H. | $3,390 | 114086849098000 | Kaja |
| EIGHT | 3/27/2014 | M.D.V. | $3,390 | 114086849097000 | Kaja |
| NINE | 5/28/2014 | F.F.P. | $2,090 | 114148866751000 | Action |
| TEN | 7/7/2014 | M.V. | $2,990 | 114188880030000 | Action |
| ELEVEN | 11/10/2014 | M.D.V. | $3,440 | 114314871006000 | Kaja |
| TWELVE | 11/19/2014 | F.F.P. | $3,440 | 114323855353000 | Kaja |
| THIRTEEN | 1/20/2015 | J.C. | $3,440 | 115020857687000 | Kaja |
| FOURTEEN | 2/13/2015 | M.V. | $3,490 | 115044841731000 | Kaja |
| FIFTEEN | 2/20/2015 | J.G.E. | $3,090 | 115051840222000 | Kaja |

| COUNT | APPROX. DATE CLAIM SUBMITTED | BENEFICIARY | APPROX. AMOUNT BILLED | CLAIM NO. | DME COMPANY |
|---|---|---|---|---|---|
| SIXTEEN | 8/4/2015 | F.F.P. | $3,440 | 115216840617000 | Kaja |
| SEVENTEEN | 11/25/2015 | E.V.V. | $3,440 | 115329816876000 | Kaja |
| EIGHTEEN | 12/16/2015 | J.C. | $1,840 | 115350850674000 | Kaja |
| NINETEEN | 5/19/2016 | M.D.V. | $3,090 | 116140843419000 | Kaja |
| TWENTY | 5/25/2016 | F.F.P. | $1,900 | 116147800853000 | Kaja |

COUNT TWENTY-ONE

[DEFENDANTS MOTLEY AND MARQUEZ]

[18 U.S.C. §§ 1028A(a)(1), 2]

25.   The Grand Jury hereby incorporates by reference and re-alleges paragraphs 1 through 23 of this Indictment as if set forth in their entirety here.

26.   Beginning in or about July 2006, and continuing through in or about August 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants MOTLEY and MARQUEZ, each aiding and abetting each other, knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendants MOTLEY and MARQUEZ knew belonged to another person, namely, the name of B.M., during and in relation to the offense of Health Care Fraud, a felony violation of Title 18, United States Code, Section 1347, as charged in Counts One, Two, Three, Four, Five, Six, Nine, and Ten of this Indictment.

COUNT TWENTY-TWO

[DEFENDANTS MOTLEY AND MARQUEZ]

[18 U.S.C. §§ 1028A(a)(1), 2]

27.   The Grand Jury hereby incorporates by reference and re-alleges paragraphs 1 through 23 of this Indictment as if set forth in their entirety here.

28.   Beginning in or about July 2013, and continuing through in or about November 2016, in Ventura County, within the Central District of California, and elsewhere, defendants MOTLEY and MARQUEZ, each aiding and abetting each other, knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendants MOTLEY and MARQUEZ knew belonged to another person, namely, the name of B.B., during and in relation to the offense of Health Care Fraud, a felony violation of Title 18, United States Code, Section 1347, as charged in Counts Seven, Eight, Eleven, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen, Eighteen, Nineteen, and Twenty of this Indictment.

1          COUNT TWENTY-THREE

2          [18 U.S.C. § 1956(h)]

3    **A.    INTRODUCTORY ALLEGATIONS**

4         29.   The Grand Jury hereby incorporates by reference and re-

5    alleges paragraphs 1 through 23 of this Indictment as if set forth in

6    their entirety here.

7         30.   Beginning no later than in or around July 2008 and

8    continuing until in or about January 2013, defendant MOTLEY exercised

9    control over a corporate bank account in Action's name at Bank of

10   America, account ending in 6183 (the "Action BofA Account").

11        31.   In or around December 2012, defendant MOTLEY and a co-

12   conspirator ("CC-1") opened a corporate bank account for Action at

13   Wells Fargo Bank, account number ending in 5194 (the "Action WF

14   Account").  Defendant MOTLEY and CC-1 maintained signatory authority

15   for this account.

16        32.   In or around September 2014, defendant MOTLEY and a co-

17   conspirator ("CC-2") opened a corporate bank account for Kaja at

18   Wells Fargo Bank, account number ending in 6297 (the "Kaja WF

19   Account").  Defendant MOTLEY and CC-2 maintained signatory authority

20   for this account.

21   **B.    THE OBJECT OF THE CONSPIRACY**

22        33.   Beginning no later than in or around July 2008 and

23   continuing to in or around January 2016, within the Central District

24   of California, and elsewhere, defendants MOTLEY, MARQUEZ, and

25   MURILLO, together with others known and unknown to the Grand Jury,

26   conspired and agreed with each other to knowingly and intentionally

27   commit an offense against the United States, namely, Money

28   Laundering, in violation of Title 18, United States Code, Section

1956(a)(1)(B)(i), by conducting and attempting to conduct financial
transactions with the intent to conceal or disguise the nature,
location, source, ownership, and control of the proceeds of some form
of specified unlawful activity, namely, Health Care Fraud, in
violation of Title 18, United States Code, Section 1347.

C.    **MEANS BY WHICH THE OBJECT OF CONSPIRACY WAS TO BE ACCOMPLISHED**

     34.   The object of the conspiracy was carried out, and to be
carried out, in substance, in the following manner and by the
following means, among others:

          a.   Defendant MOTLEY would cause to be executed and
submitted to Medicare on behalf of Action electronic funds transfer
agreements requesting that all reimbursements from Medicare be
directly deposited into the Action BofA Account and, later, into the
Action WF Account.

          b.   Defendant MOTLEY would cause to be executed and
submitted to Medicare on behalf of Kaja electronic funds transfer
agreements requesting that all reimbursements from Medicare be
directly deposited into the Kaja WF Account.

          c.   As alleged in paragraph 21 of this Indictment,
defendants MOTLEY, MARQUEZ, and MURILLO would cause Action and Kaja
to submit false and fraudulent claims, including claims for PWCs and
PWC repair or replacement services, to Medicare.

          d.   Defendant MOTLEY would cause the proceeds of the
health care fraud, that is, the Medicare reimbursements on fraudulent
claims, to be deposited into the Action BofA Account, the Action WF
Account, and the Kaja WF Account (collectively, the "Action and Kaja
Accounts").

1    e.    To conceal and disguise the location, ownership, and

2 control of the health care fraud scheme proceeds, defendant MOTLEY

3 would write checks and cause checks to be written from the Action and

4 Kaja Accounts to defendants MARQUEZ and MURILLO and others known and

5 unknown to the Grand Jury.  At times, defendant MOTLEY would falsely

6 indicate on these checks that they were for legitimate business

7 expenses, such as "bills," "office equipment" or "equipment," when,

8 in fact, as defendants MOTLEY, MARQUEZ, and MURILLO then well knew,

9 the checks were intended to be converted to cash and the cash would

10 be returned to defendant MOTLEY.

11    f.    Defendants MARQUEZ and MURILLO and others known and

12 unknown to the Grand Jury would cash the checks and return all or

13 almost all of the funds in cash to defendant MOTLEY.

14 **D.    OVERT ACTS**

15    35.    On or about the following dates, in furtherance of the

16 conspiracy and to accomplish its object, defendants MOTLEY, MARQUEZ,

17 and MURILLO, together with others known and unknown to the Grand

18 Jury, committed and willfully caused others to commit the following

19 overt acts, among others, within the Central District of California,

20 and elsewhere:

21    Overt Act No. 1:    On or about November 7, 2008, one of

22 MOTLEY's employees ("Employee 1") cashed or deposited check number

23 1957, drawn from the Action BofA Account, made payable to Employee 1,

24 and purportedly signed by CC-1 in the amount of $9,600.

25    Overt Act No. 2:    On or about July 7, 2011, defendant MARQUEZ

26 cashed or deposited check number 2683 from the Action BofA Account,

27 made payable to defendant MARQUEZ, and purportedly signed by CC-1 in

28 the amount of $8,200.

1    Overt Act No. 3:   On or about July 14, 2011, Employee 1 cashed
2    or deposited check number 2686, drawn from the Action BofA Account,
3    made payable to Employee 1, and purportedly signed by CC-1 in the
4    amount of $8,500.

5    Overt Act No. 4:   On or about March 21, 2013, defendant
6    MARQUEZ cashed or deposited check number 1076, drawn from the Action
7    WF Account, made payable to defendant MARQUEZ, and signed by
8    defendant MOTLEY in the amount of $8,400.

9    Overt Act No. 5:   On or about March 22, 2013, defendant
10    MURILLO cashed or deposited check number 1077, drawn from the Action
11    WF Account, made payable to defendant MURILLO, and signed by
12    defendant MOTLEY in the amount of $8,500.

13    Overt Act No. 6:   On or about April 9, 2013, defendant MURILLO
14    cashed or deposited check number 1105, drawn from the Action WF
15    Account, made payable to defendant MURILLO, and signed by defendant
16    MOTLEY in the amount of $7,100.

17    Overt Act No. 7:   On or about April 10, 2013, Employee 1
18    cashed or deposited check number 1106, drawn from the Action WF
19    Account, made payable to Employee 1, and signed by defendant MOTLEY
20    in the amount of $8,360.

21    Overt Act No. 8:   On or about April 11, 2013, defendant
22    MURILLO cashed or deposited check number 1107, drawn from the Action
23    WF Account, made payable to defendant MURILLO, and signed by
24    defendant MOTLEY in the amount of $8,640.

25    Overt Act No. 9:   On or about April 11, 2013, defendant
26    MARQUEZ cashed or deposited check number 1108, drawn from the Action
27    WF Account, made payable to defendant MARQUEZ, and signed by
28    defendant MOTLEY in the amount of $5,100.

1      Overt Act No. 10:   On or about April 12, an Action employee

2  ("Employee 2") cashed or deposited check number 1110, drawn from the

3  Action WF Account, made payable to Employee 2, and signed by

4  defendant MOTLEY in the amount of $7,990.

5      Overt Act No. 11:   On or about May 1, 2013, Employee 2 cashed

6  or deposited check number 1138, drawn from the Action WF Account,

7  made payable to Employee 2, and signed by defendant MOTLEY in the

8  amount of $7,750.

9      Overt Act No. 12:   On or about May 1, 2013, Employee 1 cashed

10  or deposited check number 1139, drawn from the Action WF Account,

11  made payable to Employee 1, and signed by defendant MOTLEY in the

12  amount of $7,250.

13      Overt Act No. 13:   On or about May 2, 2013, Employee 2 cashed

14  or deposited check number 1141, drawn from the Action WF Account,

15  made payable to Employee 2, and signed by defendant MARQUEZ in the

16  amount of $6,200.

17      Overt Act No. 14:   On or about May 2, 2013, defendant MARQUEZ

18  cashed or deposited check number 1142, drawn from the Action WF

19  Account, made payable to defendant MARQUEZ, and signed by defendant

20  MOTLEY in the amount of $8,000.

21      Overt Act No. 15:   On or about May 6, 2013, Employee 2 cashed

22  or deposited check number 1060, drawn from the Action WF Account,

23  made payable to Employee 2, and signed by defendant MOTLEY in the

24  amount of $8,550.

25      Overt Act No. 16:   On or about May 8, 2013, Employee 2 cashed

26  or deposited check number 1060, drawn from the Action WF Account,

27  made payable to Employee 2, and signed by defendant MOTLEY in the

28  amount of $9,400.

Overt Act No. 17:   On or about May 10, 2013, Employee 2 cashed or deposited check number 1067, drawn from the Action WF Account, made payable to Employee 2, and signed by defendant MOTLEY in the amount of $8,250.

Overt Act No. 18:   On or about July 25, 2013, defendant MURILLO cashed or deposited check number 1290, drawn from the Action WF Account, made payable to defendant MURILLO, and signed by defendant MOTLEY in the amount of $9,270.

Overt Act No. 19:   On or about July 26, 2013, defendant MARQUEZ cashed or deposited check number 1293, drawn from the Action WF Account, made payable to defendant MARQUEZ, and signed by defendant MOTLEY in the amount of $9,050.

Overt Act No. 20:   On or about July 10, 2014, defendant MARQUEZ cashed or deposited check number 2208, drawn from the Action WF Account, made payable to defendant MARQUEZ, and signed by defendant MOTLEY in the amount of $4,400.

Overt Act No. 21:   On or about July 11, 2014, defendant MARQUEZ cashed or deposited check number 2209, drawn from the Action WF Account, made payable to defendant MARQUEZ, and signed by defendant MOTLEY in the amount of $6,500.

COUNTS TWENTY-FOUR THROUGH TWENTY-NINE

[DEFENDANT MOTLEY]

[31 U.S.C. §§ 5324(a)(3), (d)(2)]

36.   The Grand Jury hereby incorporates by reference and re-alleges paragraphs 1 through 23, 30 through 32, and 34 through 35 of this Indictment as if set forth in their entirety here.

37.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant MOTLEY, and others known and unknown to the Grand Jury, knowingly and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a), and the regulations promulgated thereunder, structured, assisted in structuring, and attempted to structure and assist in structuring, the following currency transactions, namely, cash withdrawals, with domestic financial institutions:

| COUNT | DATES | TRANSACTIONS | TOTAL |
|---|---|---|---|
| TWENTY-FOUR | 12/30/2013 - 12/31/2013 | Withdrawals of $9,500 and $6,900 from Action WF Account | $16,400 |
| TWENTY-FIVE | 2/5/2014 - 2/6/2014 | Withdrawals of $9,600 and $5,200 from Action WF Account | $14,800 |
| TWENTY-SIX | 5/29/2014 - 5/30/2014 | Withdrawals of $9,000 and $6,000 from Action WF Account | $15,000 |
| TWENTY-SEVEN | 1/21/2015 | Withdrawals of $9,500 and $3,000 and check of $8,100 from Kaja WF Account | $20,600 |
| TWENTY-EIGHT | 2/17/2015 - 2/18/2015 | Withdrawals of $2,900 and $9,150 from Kaja WF Account | $12,050 |
| TWENTY-NINE | 10/7/2015 | Withdrawals of $6,000 and $6,700 from Kaja WF Account | $12,700 |

38.   Each of the violations of Title 31, United States Code, Section 5324(a)(3) alleged in Counts Twenty-Four through Twenty-Nine of the Indictment was committed while defendant MOTLEY was violating another law of the United States, namely, while defendant MOTLEY was

19

1   committing Health Care Fraud, in violation of Title 18, United States

2   Code, Section 1347, as alleged in Counts One through Twenty of this

3   Indictment, and as part of a pattern of illegal activity involving

4   more than $100,000 in a 12-month period.

5

6                                          A TRUE BILL

7

8                                          /S/
                                           ─────────────────────────
9                                          Foreperson

10  SANDRA R. BROWN
    Acting United States Attorney
11

12  _L_____

13  LAWRENCE S. MIDDLETON
    Assistant United States Attorney
14  Chief, Criminal Division

15  GEORGE S. CARDONA
    Assistant United States Attorney
16  Chief, Major Frauds Section

17  KRISTEN A. WILLIAMS
    Assistant United States Attorney
18  Deputy Chief, Major Frauds
    Section
19

20  JULIAN L. ANDRÉ
    Assistant United States Attorney
21  Major Frauds Section

22

23

24

25

26

27

28