E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
KRISTEN A. WILLIAMS (Cal. Bar No. 263594)
Deputy Chief, Major Frauds Section
DAVID H. CHAO (Cal. Bar No. 273953)
Major Frauds Section
Assistant United States Attorneys
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0526/4586
    Facsimile:  (213) 894-6269
    E-mail:  kristen.williams@usdoj.gov
             david.chao@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>TAMARA YVONNE MOTLEY,<br>  aka "Tamara Ogembe,"<br>  aka "Tamara Motley-Ogembe,"<br><br>    Defendant. | No. CR 17-774-SB<br><br>GOVERNMENT'S TRIAL MEMORANDUM<br><br>Indictment: 12/14/2017<br>Pretrial Conference: 1/27/2023 at 2:00PM<br>Trial: 2/7/2023 at 9:00AM<br>Last Day: 2/23/2023 |

Plaintiff United States of America, its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kristen A. Williams and David H. Chao, hereby files its Trial Memorandum.

//

//

//

The government respectfully requests leave to file additional memoranda as may become appropriate during the course of trial.

Defense counsel has advised the government that he does not object to the factual summary, charge elements, or government time estimate for its case-in-chief contained in this memorandum. Defense counsel further advised that he disagreed with the government's statement of certain legal issues that may arise; his objections have been noted in footnotes to those sections.

Dated: January 20, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

/s/
KRISTEN A. WILLIAMS
DAVID H. CHAO
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  CASE SCHEDULING MATTERS

This case concerns a lengthy health care fraud scheme perpetrated through two durable medical equipment ("DME") companies, Action Medical Equipment and Supply, Inc. ("Action") and Kaja Medical Equipment & Supplies, Inc. ("Kaja"). Defendant Tamara Motley ("defendant") operated both Action and Kaja.

Jury trial is set for February 7, 2023, at 9:00 a.m. The estimated time for the government's case-in-chief is seven to eight days. Trial by jury has not been waived. Defendant has been released on bond. Co-defendants Cynthia Marquez and Juan Murillo have pleaded guilty and been sentenced. (Dkt. 163, 181, 288, 314.)

Currently pending are (1) defendant's motion to suppress (Dkt. 209); (2) the government's motions in limine (Dkt. 340 (Exclude Prior Convictions of Witnesses), 341 (Admit Business Records), 343 (Admit Summary Charts)); (3) the defendant's motion in limine (Dkt. 345 (Separate Conspiracies)); (4) the government's ex parte application regarding the applicability of attorney-client privilege to certain information (Dkt. 318); and (5) the government's motion to dismiss the structuring counts (Dkt. forthcoming).

## II.  THE INDICTMENT AND ELEMENTS

Defendant was charged in an Indictment. (Dkt. 1.)

Counts one through twenty charge defendant with health care fraud, in violation of Title 18, United States Code, Section 1347, which has the following elements: (1) defendant knowingly and willfully participated in or devised a scheme or plan to defraud a health care benefit program, or a scheme or plan for obtaining money or property from a health care benefit program, by means of false or fraudulent pretenses, representations, or promises; (2) the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with the intent to defraud; that is, the intent to deceive or cheat; (4) Medicare was a health care benefit

program; and (5) the scheme involved the delivery of or payment for health care benefits, items, or services. See Ninth Circuit Model Criminal Jury Instruction No. 15.42 (2022 ed.).

If the jury determines the defendant was a member of the scheme to defraud and had the intent to defraud, the defendant may be responsible for other co-schemers' actions during and in the course of and in furtherance of the scheme, even if the defendant did not know what they said or did. For the defendant to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the offense must be one that the defendant could reasonably foresee as a necessary and natural consequence of the scheme to defraud. See Ninth Circuit Model Criminal Jury Instruction No. 15.33 (2022 ed.).

Defendant has been charged in counts 21 and 22 with aggravated identity theft, in violation of Title 18, United States Code, Section 1028A, which has the following elements: (1) the defendant knowingly transferred, possessed, or used without legal authority a means of identification of another person, (2) the defendant knew that the means of identification belonged to a real person, and (3) the defendant did so during and in relation to a violation of 18 U.S.C. § 1347. See Ninth Circuit Model Criminal Jury Instruction No. 15.9 (2022 ed.).

With respect to the health care fraud and aggravated identity theft counts, a defendant acts knowingly if the defendant is aware of the act and does not act or does not fail to act through ignorance, mistake, or accident. See Ninth Circuit Model Criminal Jury Instruction No. 4.8 (2022 ed.). A defendant acts willfully if the defendant committed the act voluntarily and purposely, and with knowledge that her conduct was, in a general sense, unlawful. See 18 U.S.C. § 1347(b); Ninth Circuit Model Criminal Jury Instruction No. 4.6 (2022 ed.); Bryan v. United States, 524 U.S. 184, 189-91, 193-96, 198-99 (1998); United States v. Awad, 551 F.3d 930, 937-41 (9th Cir. 2009).

Finally, defendant has been charged in count 23 with Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h), which

has the following elements: (1) beginning on or about July 2008, and ending on or about January 2016, there was an agreement between two or more persons to commit money laundering, and (2) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it. See Ninth Circuit Model Criminal Jury Instruction No. 11.1 (2022 ed.) (modified for money laundering). Money Laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), has the following elements: (1) the defendant or a co-conspirator conducted a financial transaction involving property that represented the proceeds of health care fraud; (2) the defendant knew that the property represented some form of unlawful activity; and (3) the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds. See Ninth Circuit Model Criminal Jury Instruction No. 18.4 (2022 ed.).

### III.   STATEMENT OF FACTS

The government intends to prove at trial the following facts, among others:

Between July 2006 and August 2014, defendant operated Action, a DME company located in Hawthorne, California, and purportedly owned by and enrolled as a Medicare provider by B.M., defendant's mother. Between January 2013 and November 2016, defendant operated Kaja, a DME company located in Ventura, California, and purportedly owned by and enrolled as a Medicare provider by B.B., defendant's nephew. Action and Kaja shared employees (including co-defendants Cynthia Marquez (office manager) and Juan Murillo (repair technician)), practices, and more than 800 Medicare patients, known as beneficiaries, in common.

The scheme worked as follows: defendant would pay marketers to recruit Medicare beneficiaries to visit certain physicians who would prescribe them medically unnecessary DME, including power wheelchairs and orthotics like back and knee braces. Defendant and others acting at her direction would pick up those prescriptions from the referring physicians or pay the marketers for those prescriptions. Defendant would cause Action to submit false and fraudulent claims for that medically unnecessary DME.

3

After Medicare stopped reimbursing providers for lump sum purchase payments for power wheelchairs in early 2011, at the direction of defendant, Action largely stopped billing Medicare for power wheelchairs and instead started billing Medicare for unnecessary power wheelchair repair and replacement services. At defendant's and Marquez's direction, Action and Kaja employees would recruit beneficiaries who were previously supplied with power wheelchairs (by Action or other DME companies) to receive unnecessary repair and replacement services, often through cold-calling where the Action and Kaja employees would tell the beneficiaries that Action or Kaja was scheduled to conduct free power wheelchair repairs or maintenance or would promise the beneficiaries other DME the beneficiaries wanted if they agreed to the repair. Action and Kaja employees would take the beneficiary information (often conveyed to them in text messages) from Marquez or others at her direction and fabricate diagnoses and "Verbal Rxs" purportedly supporting the ongoing necessity of the power wheelchairs to be repaired and generate "delivery tickets" with false service dates and serial numbers for replacement parts and with pre-ordained repairs and labor hours before any technician had even looked at the power wheelchairs, among other things. Those employees, acting at defendant and Marquez's direction, would then provide some of that fabricated information to Action and Kaja's biller, who would use it to bill Medicare for unnecessary services that typically had not even been performed. Defendant required daily updates on that billing, and in particular, on the money generated from Medicare through those billings.

Technicians working for Action or Kaja would later receive those fabricated delivery tickets, with their falsified information and pre-set repairs and labor, and take them to the homes of Medicare beneficiaries, often more than 100 miles from Action and Kaja. The technicians typically stayed 30 minutes or less, and, if anything, replaced only the power wheelchair battery, even if the replacement was not necessary at the time and/or the power wheelchair was no longer medically necessary, both of which Medicare required for reimbursement. At those beneficiary homes, technicians would see that the

4

beneficiaries were not using the power wheelchairs to carry out the activities of daily living in their homes, and, indeed, often stored their unused power wheelchairs outside of their homes or in the garage. The technicians would then have the beneficiaries sign documents (typically in English, even where the beneficiaries spoke Spanish) falsely stating that additional power wheelchair repair and replacement services, including repairs and replacements of joysticks, controllers, motors, tires, and seat lift mechanisms, were performed. Sometimes the beneficiaries' names were forged. The technicians brought that documentation back to Action and Kaja, where it would be used by defendant and others acting at her direction to bill Medicare for PWC repair and replacement services.

 Between November 2006 and August 2014, Action submitted approximately $18.25 million in claims to Medicare, primarily for PWCs and orthotics and PWC repair and replacement services, for which Medicare paid Action approximately $10.29 million. Between approximately July 2013 and November 2016, Kaja submitted approximately $6.35 million in claims to Medicare, primarily for PWC repair and replacement services, for which Medicare paid Kaja approximately $2.8 million. Defendant transferred, possessed, and used B.M.'s name during and in relation to the health care fraud counts based on Action's submission of false and fraudulent claims to Medicare, even though B.M. was rarely at Action, had no meaningful ownership or managing role, and lived out of state. Similarly, defendant transferred, possessed, and used B.B.'s name during and in relation to the health care fraud counts based on Kaja's submission of false and fraudulent claims to Medicare, even though B.M. was rarely at Action, had no meaningful ownership or managing role, and lived out of state.

 Defendant conspired with Marquez and Murillo to launder those health care fraud proceeds from Action and Kaja by conducting and attempting to conduct financial transactions with the intent to conceal or disguise the nature, location, source, ownership, and control of the proceeds of that health care fraud. In particular, defendant would write checks and cause checks to be written on Action and Kaja accounts to Marquez,

Murillo, and others, often with false memo lines suggesting these were payment for legitimate business expenses, even though, as defendant and her co-conspirators well knew, the checks were intended to be converted to cash that would be returned to defendant. Defendant paid the marketers for patient referrals using cash.

## IV. EVIDENTIARY ISSUES

### A. Hearsay

Federal Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

#### 1. Defendant's Statements, Adoptive Admissions, and Agent Admissions

The government intends to admit statements made by defendant. Statements by a party opponent when offered against that party are excluded from the hearsay definition. Fed. R. Evid. 801(d)(2)(A). Thus, defendant's statements may be admitted against her.

Statements that defendant adopted or that were made by an agent of defendant on a matter within the scope of that agency relationship are similarly admissible. Fed. R. Evid. 801(d)(2)(C), (D). Here, the government anticipates that the testimony will show that co-defendant Cynthia Marquez was often carrying out defendant's instructions in directing Action and Kaja employees, such that Marquez's statements in these contexts are admissible against defendant under Rule 801(d)(2). Additionally, a number of witnesses will testify as to the training they received from supervisors during the course of their employment at Action and Kaja and information conveyed to them by co-workers came at the direction of defendant and Marquez, who managed Action and Kaja in all respects. In addition, some of the documents were signed or adopted through use by defendant (including patient file documentation used by defendant to bill Medicare) and thus constitute adoptive admissions.[1] See United States v. Orellana-Blanco, 294

---

[1] As discussed below, the patient files are admissible based on other theories as well. See infra Section IV.A.3.

F.3d 1143 (9th Cir. 2002) (noting that "a signature would ordinarily make adoption plain"); United States v. Carrillo, 16 F.3d 1046 (9th Cir. 1994) (holding that a document possessed by a defendant is an adopted admission where the defendant takes some step to act on it to demonstrate more than mere possession of the document).

When the government offers some of a defendant's prior statements, the door is not thereby opened to the defendant to introduce all of her out-of-court statements because, when offered by the defendant, the statements are hearsay. See Fed. R. Evid. 801(d)(2); United States v. Burreson, 643 F.2d 1344, 1349 (9th Cir. 1981). Accordingly, exculpatory statements made by a defendant are hearsay and are not admissible at trial, when offered by the defendant. See Fed. R. Evid. 801(d), 802; United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000).

The only recognized limitation of this principle is the "doctrine of completeness," which has been applied by some courts to admit additional portions of a defendant's prior statements where necessary to explain an admitted statement, place it in context, or avoid misleading the trier of fact. See Fed. R. Evid. 106; Burreson, 643 F.2d at 1349; United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982). The completeness doctrine does not require introduction of portions of a statement that are neither explanatory of, nor relevant to, the admitted passages. United States v. Mitchell, 502 F.3d 931, 965 (9th Cir. 2007). Nor does the doctrine apply when a government witness is merely summarizing a defendant's statements and not playing an audio recording or introducing a written statement or transcript.[2]

---

[2] Defendant provided the following objection relevant to this section:
Defendant moves to exclude what the Government asserts are adoptive admissions, and agent/employee admissions. These items do not fall under Federal R. Evid. 801(d)(2)(C), (D).
  I.   ARGUMENT
     A.   THE GOVERNMENT HAS FAILED TO MEET THE FOUNDATIONAL REQUIREMENTS AND THE EVIDENCE SHOULD BE EXCLUDED

(footnote cont'd on next page)

|   |   |
|---|---|
| 1 | 2.  Co-Conspirator and Co-Schemer Statements |

The government intends to admit statements made by co-schemers and co-conspirators, including referring doctors and marketers, in furtherance of the health care fraud scheme and money laundering conspiracy. These statements will pertain to and help explain how the scheme and conspiracy operated.

A statement made by one co-conspirator or co-schemer during the course and in furtherance of the conspiracy or scheme may be used against another conspirator or co-schemer because such statements are not hearsay. Fed. R. Evid. 801(d)(2)(E); Bourjaily v. United States, 483 U.S. 171, 183 (1987). A statement admitted under Rule 801(d)(2)(E) does not violate the Confrontation Clause, and no independent inquiry into

---

The Government is seeking to admit evidence which they claim are "adopted admissions" or that were made by an agent/employee of defendant and are admissible pursuant to per Fed R. Evid. 801(d)(2)(C), (D). The Government anticipates that the testimony will show that co-defendant, Cynthia Marquez, was often carrying out defendant's instructions in directing Action and Kaja employees, and they argue that Marquez' statements are thus admissible against defendant under Rule 801(d)(2).

Marquez has pled guilty in this instant matter. Thus, she is a convicted felon and therefore her statements, out of context, are inherently unreliable. The Government has not put Marquez on its Witness list, and pursuant to the Confrontation Clause of the 6th Amendment to the United States Constitution, Defendant Motley should have the opportunity to confront and cross-examine this witness and challenge these statements. At a minimum, the Government must lay a proper foundation for each statement attributable to Marquez or co-conspirator Murillo.

Further, such statements are inadmissible as they were committed outside the scope of employment and thus do not fall within Fed R. Evid. 801(d)(2)(C), (D). These statements were made outside the scope of employment and thus do not meet the foundational requirements and are therefore inadmissible. Again, these co-defendants have already pled guilty and their statements are inherently unreliable and untrustworthy and the defense has the right to challenge such statements as "adoptive admissions."

B.  ANY EVIDENCE OF DOCUMENTS WHICH WERE NOT SIGNED BY DEFENDANT MOTLEY OR SUBMITTED TO MEDICARE ARE NOT ADOPTIVE ADMISSIONS AS MAINTAINED BY THE GOVERNMENT AND SHOULD BE EXCLUDED FROM EVIDENCE

The Government is seeking to introduce documents that were neither signed by the defendant nor submitted to Medicare. Documents which the Government alleges were merely in her possession do not meet the foundational requirements for an adoptive admission. In order for the Government to be able to introduce these documents as adoptive admissions, the Government must prove that Defendant Motley not simply "possessed" the document, but took "some step to act on it or demonstrate more than mere possession of the document. United States v Carillo, 16 F.3d 1046 (9th Circ. 1994) (Emphasis added). Any document for which the Government cannot prove more than mere possession must be excluded.

reliability is needed. Bourjaily, 483 U.S. at 183-84; United States v. Knigge, 832 F.2d 1100, 1107 (9th Cir. 1987), amended, 846 F.2d 591 (9th Cir. 1988). Rule 801(d)(2)(E) requires a foundation that: (1) the declaration was made during the life of the conspiracy; (2) the declaration was made in furtherance of the conspiracy; and (3) there is, including the co-conspirator's declaration itself, sufficient proof of the existence of the conspiracy and defendant's connection to it. Bourjaily, 483 U.S. at 173, 181; United States v. Smith, 893 F.2d 1573, 1578 (9th Cir. 1990). These foundational requirements must be established by a preponderance of the evidence. Bourjaily, 483 U.S. at 175; United States v. Schmit, 881 F.2d 608, 610 (9th Cir. 1989). To be admissible under Rule 801(d)(2)(E), the statement must "further the common objectives of the conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]." United States v. Aramula-Ruiz, 987 F.2d 599, 607-08 (9th Cir. 1993); United States v. Yarborough, 852 F.2d 1522, 1535 (9th Cir. 1988).[3]

### 3. Patient Files

The government intends to introduce into evidence patient files seized from Action and Kaja, and produced by Kaja pursuant to a subpoena.

The patient files contain fraudulent medical records. None of the documents in the patient files contains hearsay statements because they are business records, statements of the defendant or her agents, and/or statements of medical diagnosis or treatment and describe medical histories. See Fed. R. Evid. 801(d)(2)), 803(4), 803(6).

---

[3] Defendant provided the following objection relevant to this section:

As for the co-conspirator / co-schemer statements, Defense contends that the Government has failed to meet the foundational requirements for these statements to be admissible. The burden is on the Government by preponderance of evidence and that must be met for each statement. Specifically, with regards to any statements from Marquez or Murillo the same arguments above apply - they are inherently unreliable and untrustworthy. Pursuant to the Confrontation Clause of the 6th Amendment the defense should have the opportunity to confront and cross-examine these witnesses and challenge these statements. The same argument applies to any statement attributed to Dr. Chukwudi. Dr. Chukwudi was indicted and is now a fugitive. The Confrontation Clause applies to him as well as the co-defendants that pled guilty.

Moreover, with much of the information in the patient files (descriptions of patients' conditions and the purported repairs, for example), the government does not intend to offer the statements for their truth, but to show that statements and representations contained within the files are false and fraudulent. See Anderson v. United States, 417 U.S. 211, 219-20 (1974) ("The election contest testimony of Tomblin and Browning, however, was not admitted into evidence in the [§] 241 trial to prove the truth of anything asserted therein. Quite the contrary, the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false."); Knigge, 832 F.2d at 1108.

### B. Expert Testimony

The government has noticed that it intends to introduce expert testimony from Cindy White, who is employed by a Medicare contractor. The government anticipates that Ms. White will testify about, among other things, Medicare procedures and rules with respect to durable medical equipment generally and power wheelchairs and power wheelchair accessories and repairs, as well as the materiality to Medicare of certain information. This kind of testimony is proper in fraud scheme prosecutions because it goes to the victim's state of mind, and demonstrates whether the scheme was capable of misleading the victim. See Phillips v. United States, 357 F.2d 297, 307-09 (9th Cir. 1965).

Moreover, as a representative of the victim of the fraud, Ms. White may answer hypothetical "what if" or "if you had known" questions regarding whether Medicare would have paid for the services and items at issue in this case if Medicare had known of certain facts. Such testimony tends to prove the existence of the scheme to defraud, the effect that the concealed facts would have had on Medicare if Medicare had known them, the materiality of the concealed facts, and the deceptive nature of the representations or omissions. See United States v. Ranney, 719 F.2d 1183, 1187-89 (1st Cir. 1983); United States v. Bush, 522 F.2d 641, 649-51 (7th Cir. 1975). While the

government is not required to prove that Medicare was actually defrauded, it may use as proof testimony that the scheme did, in fact, deceive Medicare. See Phillips, 357 F.2d at 308.

Although the government does not believe the primary care physicians of certain Medicare beneficiaries, who will testify based on their personal knowledge of their patients' prior treatment and conditions, are expert witnesses, it has nonetheless disclosed the substance of their testimony through reports of interviews and has produced their curriculum vitae. In the government's disclosure letters, it has requested that defendant advise the government if she felt the notice was insufficient so that additional information could be supplied. (See generally Gov't Opp. to Murillo Mot. re Medical Necessity Evidence at 12-13, CR 143.) To date, defendant has not requested additional disclosures relating to those witnesses.

### C. Authentication and Foundation

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Under Rule 901(a), evidence should be admitted, despite any challenge, once the government makes a *prima facie* showing of authenticity or identification so "that a reasonable juror could find in favor of authenticity or identification . . . [because] the probative force of the evidence offered is, ultimately, an issue for the jury." United States v. Chu Kong Yin, 925 F.2d 990, 996 (9th Cir. 1991) (citations and internal quotation marks omitted); see also United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985). The government need not establish all links in the chain of custody of an item or call all persons who were in a position to come into contact with it. See Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1960). Alleged gaps in the chain of custody go to the weight of the evidence rather than to its admissibility. See United States v. Taylor, 716 F.2d 701, 711 (9th Cir. 1983). A duplicate is admissible to the same extent as the original, unless there is a genuine question as to the authenticity of the original or

it would be unfair under the circumstances to admit the duplicate in lieu of the original. See Fed. R. Evid. 1003; Smith, 893 F.2d at 1579.

### D.    Evidence Related to Victim Medicare

It is well settled that negligence of a victim in failing to discover a fraudulent scheme is not a defense to criminal conduct. United States v. Lindsey, 850 F.3d 1009, 1015 (9th Cir. 2017). Thus, any evidence defendant may attempt to introduce regarding the susceptibility of Medicare to fraud is irrelevant and should not be admitted. See id. (citing cases); United States v. Colton, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the victim of the fraud . . . is irrelevant to the analysis: If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright." (internal quotation marks omitted)).

Evidence of violations of Medicare regulations can be evidence of knowledge and intent. See Awad, 551 F.3d at 940.

### E.    Cross-Examination of Defendant

A defendant who testifies at trial may be cross-examined as to all matters reasonably related to the issues she puts in dispute during direct examination. "A defendant has no right to avoid cross-examination on matters which call into question his claim of innocence." United States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981).

Defendant's credibility will be crucial if she chooses to testify in order to refute the government's showing of knowledge and intent. Indeed, because defendant is the only witnesses with "direct" evidence of her own knowledge and intent, if she takes the stand to deny any knowledge of the fraud, her credibility becomes a key issue.

Moreover, the government is not required to provide notice of matters about which it may seek to cross-examine defense witnesses, including defendant, should they testify.

### F. Defense Witnesses

To date, defendant has neither provided a witness list to the government nor identified any witnesses she intends to call. Defendant has indicated this list will be provided by January 22, 2023. To the extent defendant elects to call witnesses at trial, the government requests that the Court order defendant to disclose their names and dates of birth at least 24 hours in advance of their testimony, and to provide an offer of proof with respect to the anticipated testimony of those witnesses so that the government may assess whether their testimony would be relevant and otherwise admissible, and whether their testimony would implicate any Fifth Amendment rights those witnesses might have, before the witnesses take the stand.

### G. Character Evidence

The Supreme Court has recognized that character evidence – particularly cumulative character evidence – has weak probative value and great potential to confuse the issues and prejudice the jury. See Michelson v. United States, 335 U.S. 469, 480, 486 (1948). The Court has thus given trial courts wide discretion to limit the presentation of character evidence. Id.

In addition, the form of the proffered evidence must be proper. Federal Rule of Evidence 405(a) sets forth the sole methods by which character evidence may be introduced. It specifically states that, where evidence of a character trait is admissible, proof may be made in two ways: (1) by testimony as to reputation and (2) by testimony as to opinion. Thus, a defendant may not introduce specific instances of his or her good conduct through the testimony of others. See Michelson, 335 U.S. at 477. On cross-examination of a defendant's character witness, however, the government may inquire into specific instances of a defendant's past conduct relevant to the character trait at issue. See Fed. R. Evid. 405(a). In particular, a defendant's character witnesses may be cross-examined about their knowledge of the defendant's past crimes, wrongful acts, and arrests. See Michelson, 335 U.S. at 481. The only prerequisite is that there must be a

good faith basis that the incidents inquired about are relevant to the character trait at issue. See United States v. McCollom, 664 F.2d 56, 58 (5th Cir. 1981).

### H. Reciprocal Discovery and Expert Disclosures

The United States has requested reciprocal discovery, Jencks material, and expert disclosures from defendant. In spite of these requests, other than four reports of interviews conducted by a defense investigator provided by defendant's counsel on October 20, 2017, prior to indictment, the government has not received any reciprocal discovery, including any planned exhibits or witness statements from any witnesses defendant intends to call at trial. The government has requested reciprocal discovery in all of its discovery production letters.

Thus, to the extent defendant may attempt to introduce or use any documents at trial that she has not previously produced, the United States reserves the right to object and to seek to have such documents precluded.

### I. Jury Nullification

The Court should exclude any evidence and/or argument relating to or concerning any possible jury nullification defense. This includes any evidence and/or argument meant to play on the jury's sympathy for defendant, particularly pertaining to her role as a parent to young children.

It is well established that a defendant does not have a right to a jury nullification instruction. United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992). Having no right to seek jury nullification, defendant has no right to present evidence relevant only to such a defense. Zal v. Steppe, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring) ("[N]either a defendant nor his attorney has a right to present to a jury evidence that is irrelevant to a legal defense to, or an element of, the crime charged. Verdicts must be based on the law and the evidence, not on jury nullification as urged by either litigant.").

Since they do not make any fact in issue more or less probable, evidence and arguments meant to play on the jury's sympathy are not relevant under Federal Rule of

Evidence 401 and must be excluded on that basis.  In addition, appeals to sympathy are unduly prejudicial and confusing to the jury and misleading under Rule 403 and, therefore, properly excluded on that basis even if they had some arguable relevance.