E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
KRISTEN A. WILLIAMS (Cal. Bar No. 263594)
Deputy Chief, Major Frauds Section
DAVID H. CHAO (Cal. Bar No. 273953)
Deputy Chief, General Crimes Section
Assistant United States Attorneys
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0526/4586
    Facsimile: (213) 894-6269
    E-mail: kristen.williams@usdoj.gov
           david.chao@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> TAMARA YVONNE MOTLEY, <br>  aka "Tamara Ogembe," <br>  aka "Tamara Motley-Ogembe,", <br><br> Defendant. | No. CR 17-774-SB-1 <br><br> GOVERNMENT'S RESPONSE TO PRESENTENCE REPORT AND SENTENCING POSITION FOR DEFENDANT TAMARA MOTLEY; DECLARATION OF KRISTEN A. WILLIAMS AND EXHIBITS THERETO <br><br> Hearing Date: November 7, 2023 <br> Hearing Time: 8:00 a.m <br> Location: Courtroom of the Hon. Stanley Blumenfeld, Jr. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kristen A. Williams and David H. Chao, hereby files its response to the presentence report and sentencing position relating to defendant TAMARA YVONNE MOTLEY.

///

///

1   This response and sentencing position is based upon the attached memorandum of
2   points and authorities, the attached declaration of Kristen A. Williams and exhibits
3   thereto, the files and records in this case, and such further evidence and argument as the
4   Court may permit.

5   Dated: October 24, 2023         Respectfully submitted,

6                                    E. MARTIN ESTRADA
                                     United States Attorney
7
                                     MACK E. JENKINS
8                                    Assistant United States Attorney
                                     Chief, Criminal Division
9

10                                   _____
                                     KRISTEN A. WILLIAMS
11                                   DAVID H. CHAO
                                     Assistant United States Attorney
12
                                     Attorneys for Plaintiff
13                                   UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION                                                                                               PAGE

**Contents**

TABLE OF AUTHORITIES ................................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.    INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................. 2

III.    THE PRESENTENCE REPORT AND GUIDELINE CALCULATION .............. 6

    A.    Fraud Loss Involving Government Health Care Program .......................... 7

    B.    Money Laundering Enhancement ................................................................ 7

    C.    Aggravated Role Enhancement .................................................................... 8

IV.    THE APPROPRIATE SENTENCE UNDER THE GUIDELINES AND SECTION 3553(a) ................................................................................................ 8

    A.    A 180-Month Sentence Is Reasonable Given the Nature and Circumstances of the Offense and the History and Characteristics of Defendant ..................................................................................................... 9

    B.    A 180-Month Reflects the Seriousness of the Offense and Affords Adequate Deterrence .................................................................................. 11

    C.    A 180-Month Sentence Does Not Create Unwarranted Sentencing Disparities ................................................................................................... 13

    D.    The Remaining Section 3553(a) Factors Also Support the Requested Sentence ...................................................................................................... 15

V.    CONCLUSION ................................................................................................... 15

DECLARATION OF KRISTEN A. WILLIAMS ............................................................. 16

# TABLE OF AUTHORITIES

DESCRIPTION                                                                                                                  PAGE

**FEDERAL CASES**

Gall v. United States,
    552 U.S. 38, 128 S. Ct. 586 (2007) ........................................................................ 13

United States v. Cantrell,
    433 F.3d 1269 (9th Cir. 2006) ................................................................................ 8

United States v. Knows His Gun,
    438 F.3d 913 (9th Cir. 2006) .................................................................................. 8

United States v. Nichols,
    464 F.3d 1117 (9th Cir. 2006) ................................................................................ 8

United States v. Saeteurn,
    504 F.3d 1175 (9th Cir. 2007) .............................................................................. 14

United States v. Treadwell,
    593 F.3d 990 (9th Cir. 2010) ........................................................................ 13, 14

**FEDERAL STATUTES**

18 U.S.C. § 3553(a) ..................................................................................................passim

**SENTENCING GUIDELINES**

U.S.S.G. § 2B1.1 .............................................................................................................. 7

U.S.S.G. § 2S1.1 .............................................................................................................. 7

U.S.S.G. § 5B1.1 ............................................................................................................ 15

U.S.S.G. § 5C1.1 ............................................................................................................ 15

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

A jury found defendant TAMARA YVONNE MOTLEY guilty of health care fraud, aggravated identity theft, and conspiracy to launder monetary instruments, arising from her scheme to defraud vulnerable government health benefit programs through fraudulent claims for power wheelchairs and related repairs that were medically unnecessary and often never provided. Over the course of nearly a decade, defendant's companies submitted more than $24 million in fraudulent claims to Medicare and Medi-Cal and were paid more than $13 million. To conceal her role in the fraud, defendant listed her mother and nephew as the owners of the companies in Medicare paperwork, and instructed her staff to cash company checks and return the cash to her.

In the Presentence Report ("PSR") (CR 499), the Probation Officer calculated a total offense level of 36 and a Criminal History Category of II. The Probation Officer recommended a total custodial sentence of 240 months, consisting of 120 months on each of Counts 1 through 20; 216 months on Count 23 (to be served concurrently); and 24 months on each of Counts 21 and 22 to be served concurrently with each other and consecutively to the other counts of conviction. The Probation Officer further recommended a three-year term of supervised release, payment of a $2,300 special assessment, and payment of restitution in the amount of $13,107,422.80.

The government concurs with the Probation Officer's Guidelines calculation, which appropriately takes into account the significant losses caused to vulnerable government programs, her role in orchestrating the fraud, and her laundering of its proceeds.

And it is clear that defendant's crimes were serious. She committed a brazen and elaborate fraud spanning nearly a decade. Equally disturbing as *what* defendant did, was *how* she did it. As the evidence at trial showed, defendant manipulated those around her to serve her criminal ends. She used relatives and employees to conceal her role in the scheme, and even used her infant's caretaker to carry out the illegal activities of her

scheme. She took advantage of vulnerable Medicare beneficiaries in far-flung places like Calexico who were elderly and often non-English speaking. She deceived inspectors to preserve her companies' accreditation with Medicare. Defendant also displayed little respect for the law, continuing the submission of fraudulent claims after Medicare restricted its policy for reimbursing power wheelchairs, and even after first Action and then Kaja were searched by law enforcement. Despite the weight of evidence and the jury's verdicts, defendant showed no remorse or acceptance of responsibility for her actions.

Nonetheless, the sentence imposed here should be no greater than necessary to reflect the goals of sentencing. Here, in light of the factors the Court must consider under 18 U.S.C. § 3553(a) – in particular the need to avoid sentencing disparities and consider defendant's history, including the relatively minor criminal history that places her in Criminal History Category II – a sentence of 180 months, while below-Guidelines, is substantial enough to balance the aggravating and mitigating factors and effect just punishment, promote respect for the law, and deter similar attacks on Medicare by defendant and others of like mind.

## II. STATEMENT OF FACTS

Between July 2006 and August 2014, defendant operated Action, a DME company located in Hawthorne, California. Between January 2013 and November 2016, defendant operated Kaja, a durable medical equipment ("DME") company located in Ventura, California. Action and Kaja shared employees (including co-defendants Cynthia Marquez (office manager) and Juan Murillo (repair technician)), practices, and more than 800 Medicare patients, known as beneficiaries, in common. (PSR ¶ 11.)

As the Court knows from trial, defendant and her staff carried out a scheme to defraud Medicare and Medi-Cal. Initially, defendant paid marketers to recruit Medicare beneficiaries to visit certain physicians who would prescribe them medically unnecessary DME, including power wheelchairs and orthotics like back and knee braces. (PSR ¶ 18-21; Tr. Ex. 217, 255, 513, 523.) Defendant and others acting at her direction

would pick up those prescriptions from the referring physicians or pay the marketers for those prescriptions. (PSR ¶ 20; Tr. Ex. 224, 257.) Defendant would cause Action to submit false and fraudulent claims for that medically unnecessary DME. (PSR ¶ 21.) Often the billed products were refused or were not delivered. (Tr. Ex. 215, 217, 221, 222, 224, 275.)

After Medicare stopped reimbursing providers for lump sum purchase payments for power wheelchairs in early 2011, at the direction of defendant, Action largely stopped billing Medicare for power wheelchairs and instead started billing Medicare for unnecessary power wheelchair repair and replacement services. (PSR ¶ 22; Tr. Ex. 508.) As defendant's and Marquez's direction, Action and Kaja staff – including trial witness Jacqueline Quinonez -- would recruit beneficiaries who were previously supplied with power wheelchairs (by Action or other DME companies) to receive unnecessary repair and replacement services, often through cold-calling where the Action and Kaja employees would tell the beneficiaries that Action or Kaja was scheduled to conduct free power wheelchair repairs or maintenance or would promise the beneficiaries other DME the beneficiaries wanted if they agreed to the repair. (PSR ¶ 23; Tr. Ex. 242.) Action and Kaja employees would take the beneficiary information (often conveyed to them in text messages) and fabricate diagnoses and "Verbal Rxs" purportedly supporting the ongoing necessity of the power wheelchairs to be repaired and generate "delivery tickets" with false service dates and serial numbers for replacement parts and with pre-ordained repairs and labor hours before any technician had even looked at the power wheelchairs, among other things. (PSR ¶ 24.) Those employees, such as trial witnesses Violeta Vega and Maria Vargas, acting at defendant and Marquez's direction, would then provide some of that fabricated information to Action and Kaja's biller, who would use it to bill Medicare for unnecessary services that typically had not even been performed. (Id.) Defendant required daily updates on that billing, and in particular, on the money generated from Medicare through those billings. (Id.)

While repairs at times were never performed, to the extent any services were provided, technicians working for Action or Kaja would receive those fabricated delivery tickets, with their falsified information and pre-set repairs and labor, and take them to the homes of Medicare beneficiaries, often more than 100 miles from Action and Kaja. (PSR ¶ 25.) As the Court heard from the trial testimonies of Medicare beneficiaries and former repairman Ricardo Hinojosa, the technicians typically stayed 30 minutes or less, and, if anything, typically replaced only the power wheelchair battery, even if the replacement was not necessary at the time to make the power wheelchair functional and/or the power wheelchair was no longer medically necessary, both of which Medicare required for reimbursement. (Id.) At those beneficiaries' homes, technicians would see that the beneficiaries were not using the power wheelchairs to carry out the activities of daily living in their homes, and, indeed, often stored their unused power wheelchairs outside of their homes or in the garage. The technicians would then have the beneficiaries sign documents (typically in English, even when the beneficiaries only spoke Spanish) falsely stating that additional power wheelchair repair and replacement services, including repairs and replacements of joysticks, controllers, motors, tires, and seat lift mechanisms, were performed. (PSR ¶ 26.) Sometimes the beneficiaries' names and/or signatures were forged. The technicians brought that documentation back to Action and Kaja, where it would be used to create files purportedly supporting the billing for those services, which billing had typically already been submitted. (Id.)

Between November 2006 and August 2014, Action submitted approximately $18.25 million in claims to Medicare, primarily for PWCs and orthotics and PWC repair and replacement services, for which Medicare paid Action approximately $10.29 million. (PSR ¶ 27; Tr. Ex. 508.) Between approximately July 2013 and November 2016, Kaja submitted approximately $6.35 million in claims to Medicare, primarily for PWC repair and replacement services, for which Medicare paid Kaja approximately $2.8 million. (Id.; Tr. Ex. 514.)

Defendant committed additional crimes to conceal her role in the scheme. First, defendant used her mother's name in Action's Medicare enrollment and billing paperwork as well as compliance and training documents, even though her mother was rarely at Action, had no meaningful ownership or managing role, and lived out of state. Similarly, defendant used her nephew's name in Kaja's Medicare paperwork and throughout company documents, even though her nephew was rarely at Kaja, had no meaningful ownership or managing role, and lived out of state. (PSR ¶¶ 28-29; Tr. Ex. 55, 58-62, 66, 69, 70, 201, 268, 414, 418.)

Second, defendant conspired with Marquez and others to launder the proceeds of the fraud with the intent to disguise the ownership and control of those funds. In particular, defendant would write checks and cause checks to be written on Action and Kaja accounts, which were payable to Marquez, Murillo, and others, often with false memo lines suggesting these were payment for legitimate business expenses, even though, as defendant and her co-conspirators well knew, the checks were intended to be converted to cash that would be returned to defendant. (PSR ¶ 31; e.g., Tr. Ex. 112, 114, 129, 130.) Indeed, defendant benefitted handsomely from her scheme, both in the form of abundant cash withdrawals and luxury retail and travel purchases. (PSR ¶¶ 32-34; Tr. Ex. 501, 503, 507, 518, 519, 520, 521.)

Finally, while not explicitly addressed in the indictment or trials in this case, the government's investigation also revealed that, contemporaneous with defendant's work with Action, defendant was also engaged in similar schemes at three more DME suppliers (AM Medical Distributors, Inc. ("AM Medical"); Trey Medical Distributors, Inc. ("Trey"); and Smitty Medical Supply, Inc. ("Smitty")) in the names of three more of her relatives and associates.[1] These companies submitted claims for the same kinds of

---

[1] Although the government provided evidence of these schemes to the Probation Officer, the PSR does not reference these activities. The government objects to this omission and respectfully submits that they are, at a minimum, relevant to the Court's evaluation of defendant's history and characteristics and risk of recidivism under the Section 3553(a) factors.

5

DME (power wheelchairs and orthotics) for which Action billed Medicare and involving some of the same complicit referring providers.  AM Medical– in the name of defendant's uncle Ausie Motley ("A. Motley") but run by defendant – billed Medicare more than $960,000 in 2009, and was paid more than $404,000, on claims for power wheelchairs and orthotics purportedly ordered by doctors such as Drs. Eugene Hubbard, Artis Woodward, and Phillip Sokolsky.  (See Exhibit A to the Declaration of Kristen A. Williams ("Williams Decl.") (interview of A. Motley); Exhibit B to the Williams Decl. (AM Medical Medicare claims information).)  A. Motley did not recognize his handwriting on Medicare application forms for AM Medical.  (See Exhibit A to the Williams Decl.)  Trey – in the name of defendant's nephew John Motley ("J. Motley") but run by defendant – billed Medicare more than $903,000 in 2010 and 2011, and was paid more than $450,000, mostly for orthotics, purportedly ordered by Dr. Uche Chukwudi (currently a fugitive in United States v. Chukwudi, et al., CR 12-1170-MWF). (See Exhibit C to the Williams Decl. (interview of J. Motley); Exhibit D to the Williams Decl. (Trey Medicare claims information).)  J. Motley opened but never accessed a bank account for Trey and did not know where the patient records were kept.  (See Exhibit C to the Williams Decl.)  A records request from Medicare contractor SafeGuard Services to Trey was found during the search of Action and bore handwritten notes as to undelivered equipment and marketers who referred the patients.  (See Exhibit E to the Williams Decl.)  Smitty, purportedly owned by Danielle Smith, billed Medicare more than $417,000 in 2010 and 2011 (but received no payments), mostly for orthotics, most of which were purportedly ordered by Dr. Chukwudi.  (Exhibit F to the Williams Decl. (Smitty Articles of Incorporation); Exhibit G to the Williams Decl. (Smitty Medicare claims information).  Former Motley employee Dulce Anguiano, who testified at trial, informed agents that she previously worked for Motley at Smitty.  (Williams Decl. ¶ 6.)

### III. THE PRESENTENCE REPORT AND GUIDELINE CALCULATION

In the PSR, the Probation Officer calculated a total offense level of 36 as follows:

|   | Base Offense Level: | 30 | [U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(2), (b)(1)(K), (b)(7)(B)(iii)] |
|---|---|---|---|
|   | Conviction under 1956 | +2 | [U.S.S.G. § 2S1.1(b)(2)(B)] |
|   | Aggravated Role | +4 | [U.S.S.G. § 3B1.1(a)] |
|   | TOTAL: | 36 |   |

(PSR ¶¶ 46-57.) The Probation Officer also found that defendant has three criminal history points, falling within Criminal History Category II. (PSR ¶¶ 64-72.) Before the application of the two mandatory consecutive sentences under Section 1028A, the applicable Guidelines range is 210 to 262 months of imprisonment. (PSR ¶ 125.) As discussed below, the government agrees with the Probation Officer's Guidelines calculation.

### A.   Fraud Loss Involving Government Health Care Program

The Probation Officer correctly determined that Action and Kaja billed Medicare and Medi-Cal approximately $24,664,373.20. The amount billed to those federal health benefit programs is *prima facie* evidence of the total intended loss. See U.S.S.G. § 2B1.1, App. Note 3(F)(viii). Pursuant to Section § 2B1.1(b)(1)(K), a 20-level increase for a loss exceeding $9.5 million but not more than $25 million applies. In addition, Section 2B1.1(b)(7) provides for an increase in the offense level where, as here, the defendant was convicted of a federal health care offense involving a government health care program, namely, Medicare and Medi-Cal. Because the loss amount under Section 2B1.1(b)(1) exceeded $20 million, a four-level increase under Section 2B1.1(b)(7)(iii) applies. Based on the foregoing, the Probation Officer correctly arrived at a base offense level of 30.

### B.   Money Laundering Enhancement

U.S.S.G. § 2S1.1(b)(2)(B) provides for a two-level increase if the defendant was convicted under 18 U.S.C. § 1956. Here, the two-level increase applies because defendant was convicted under 18 U.S.C. § 1956(h).

### C. Aggravated Role Enhancement

The Probation Officer correctly determined that a four-level increase applies to reflect the aggravated role of defendant. Defendant was the de facto owner and operator of both Action and Kaja and organized and led the criminal activity there, which involved five or more others, including co-defendants Cynthia Marquez and Juan Murrillo, as well as complicit doctors like Dr. Eugene Hubbard, Dr. Uche Chukwudi, and physician's assistant Linda Lewis, and marketers like Maritza Hernandez. Defendant also received the lion's share of the fruits of the crime, as reflected in her substantial cash withdrawals and travel and luxury retail purchases using the company bank accounts. Thus, a four-level enhancement applies under Section 3B1.1(a).

## IV. THE APPROPRIATE SENTENCE UNDER THE GUIDELINES AND SECTION 3553(a)

Based on a total offense level of 36 and a Criminal History Category of II, the applicable Guidelines sentencing range in this case is 210 to 262 months of imprisonment before the application of the mandatory consecutive sentence for aggravated identity theft. While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered with the factors set forth in 18 U.S.C. § 3553(a). See United States v. Cantrell, 433 F.3d 1269, 1279 (9th Cir. 2006). "To comply with the requirements of *Booker*, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a). This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence." United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d 913, 918 (9th Cir. 2006)).

The Section 3553(a) factors are as follows:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

8

2) The need for the sentence imposed –

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for the offense and the defendant as set forth in the Sentencing Guidelines;

5) Any pertinent policy statement issued by the Sentencing Commission;

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The factors set forth in 18 U.S.C. § 3553(a) are satisfied by a 180-month sentence and such a sentence is "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below. 18 U.S.C. § 3553(a).

### A. A 180-Month Sentence Is Reasonable Given the Nature and Circumstances of the Offense and the History and Characteristics of Defendant

Defendant engaged in a decade-long scheme to swindle the Medicare and Medi-Cal programs through claims for some of the most expensive DME and DME repairs. When Medicare attempted to crack down on those claims by moving power wheelchair reimbursements from lump-sum to monthly rentals, defendant pivoted, drawing on her rolodex of beneficiaries from Action and other DMEs that she knew had power wheelchairs to use that same information to bill for repeated repairs of those same unnecessary wheelchairs. The Medicare beneficiaries were the pawns in this game, dragged long distances to unfamiliar doctors to obtain orders for DME they did not need or forced to deal with large DME that just appeared at their house and would often end

up stored in a garage or closet. Defendant turned those beneficiaries into money, using their information and their signatures (if not just forged) to provide supposed support for fraudulent claims. Defendant used those proceeds in part to promote her scheme through payments to marketers who would recruit the beneficiaries, and concealed her own involvement and benefit by having others cash checks for her. Her crimes exploited a system that tries to pay first and chase later and exploited elderly Medicare beneficiaries who had little say in the matter.

In mitigation, defendant may point to her prior history of abuse and her claims of substance abuse problems. (See PSR ¶¶ 82-87, 95-101.)

As to the first, while the government is sympathetic to what appears to have been a series of traumatic experiences, it is not clear that those events have any bearing on defendant's conduct here. Her past did not keep her from opening up multiple businesses and hiding behind others as she used them to commit fraud for a decade. In fact, former employees and associates like Angelica Morales, Bianca Rico, and others consistently testified as to defendant's imposing presence that stifled questioning, her focus on the bottom line, and her temper when crossed. Despite her claim now that she suffered from domestic violence, defendant sought to portray herself at trial as a de facto single mom devoted to her Nigerian senator husband, whom she frequently visited abroad. Indeed, it was defendant who sought to discuss her husband and her visits to him at trial in the face of the government's arguments that such was irrelevant and an improper bid for jury sympathy. (See, e.g., CR 402, 455.)

As to the second, the government notes that her bond governing her release for much of the pendency of this case did not include any terms related to the use of drugs or alcohol or drug or alcohol testing (see CR 65), which terms would typically be ordered in instances where those issues were disclosed as present at the outset of the case (and which would have led to more intensive supervision). Thus, though defendant now claims a variety of substance abuse issues and that she was using cough syrup and marijuana during the offense, and thus was "not as sharp" and "forgot everything" (PSR

10

¶ 100), these issues were not raised as matters for Pretrial Services to address at the outset of the case and offer a picture quite different from that painted of defendant at trial by witnesses to her crimes. Even if the Court credits defendant's current claims regarding substance abuse, that factor is ordinarily not a reason for downward departure. U.S.S.G. § 5H1.4.

However, while the above factors do not warrant a variance from the applicable guidelines range, defendant's criminal history (although correctly calculated to place her in Criminal History Category II (PSR ¶¶ 64-72)) does appear to be relatively dated and minor considering the significant bump it causes in the applicable sentencing range. This is not to minimize these prior contacts with law enforcement – they reflect a worrying disrespect for the law and property that supports the below arguments for the need for specific deterrence – but, when viewed in context, appear to play an out-sized role in increasing the sentence called for here.

In light of the aggravating and mitigating factors discussed above, a 180-month sentence is a reasonable one.

### B. A 180-Month Reflects the Seriousness of the Offense and Affords Adequate Deterrence

As discussed above and as the Court is aware from the two trials in this matter, defendant's conduct was serious in terms of its duration, scope, and the losses it caused to particularly vulnerable government programs using the information of particularly vulnerable Medicare beneficiaries. While the losses she caused may not represent the largest this District has seen, they far exceed the nationwide median health care fraud offense loss as of 2022 ($1,297,560) and exceed the losses seen in many seen in DME fraud cases in this District. See FY 2022 Quick Facts, United States Sentencing Commission, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Health_Care_Fraud_FY22.pdf (last visited Oct. 24, 2023) ("FY 2022 Quick Facts") (facts concerning health care fraud offenses in fiscal year 2022). (See, e.g., United States v. Adeline Ekwebelem, CR 12-1170-MWF, Dkt. 107 ($7.3

11

million power wheelchair fraud scheme); United States v. Charles Agbu, et al., CR 11-134-GW, Dkt. 1 ($11 million power wheelchair fraud scheme); United States v. Uben Rush, CR 09-679-GHK, Dkt. 1 ($15 million power wheelchair fraud scheme).  Because defendant's conduct was serious, it deserves a serious sentence, like the 15-year sentence recommended here.

Moreover, defendant doubled-down on her conduct even after law enforcement searched Action, continuing her scheme over at Kaja, another company where her involvement was concealed from Medicare.  That fact, together with her contemporaneous connection with three other DME companies (AM Medical, Smitty, and Trey), demonstrates the need for a significant sentence to deter defendant specifically from engaging in criminal conduct in the future.  Nor should the Court be swayed by claims that defendant's age makes her unlikely to recidivate.  The average age of all health care fraud defendants as of 2022 was 49, only a few years younger than defendant is now.  See FY 2022 Quick Facts.

There is also a great need for general deterrence here.  Health care fraud prosecutions have increased since 2018 and news reports reflect considerable health care fraud in this District and nationwide, causing increasingly greater losses to Medicare and other insurers.  See FY 2022 Quick Facts; see, e.g., Spencer Kimball, *Justice Department Charges 78 People with $2.5 Billion in Health-Care Fraud*, CNBC.com (June 28, 2023), https://www.cnbc.com/2023/06/28/doj-charges-78-people-with-2point5-billion-in-health-care-fraud.html; U.S. Department of Justice Office of Public Affairs, *Justice Department Charges Dozens for $1.2 Billion in Health Care Fraud* (July 20, 2022), https://www.justice.gov/opa/pr/justice-department-charges-dozens-12-billion-health-care-fraud.  Significant custodial sentences are necessary to deter others who may be inclined to join this crowd.

A 180-month sentence serves the need to address defendant's serious conduct and provide specific and general deterrence.

### C. A 180-Month Sentence Does Not Create Unwarranted Sentencing Disparities

Pursuant to 18 U.S.C. § 3553(a)(6), the Court is required to minimize sentencing disparity among similarly situated defendants. One way of doing so is to correctly calculate the Guidelines range. See United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010), overruled on other grounds by United States v. Miller, 953 F.3d 1095 (9th Cir. 2020) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted disparity' . . . ."); see also Gall v. United States, 552 U.S. 38, 54, 128 S. Ct. 586, 599 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Sentencing Guidelines ranges. Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."). Under this authority, the 240-month sentence recommended by the Probation Officer would avoid unwarranted sentencing disparities because it is within the correctly calculated Guidelines range.

However, a review of sentences imposed on other similarly situated defendants convicted of health care fraud in this District is more consistent with the government's recommended 180-month sentence. For example, in United States v. Sandy Nguyen, a pharmacist was convicted at trial and sentenced to 15 years for a health care fraud scheme concerning bogus compounded drug prescriptions that cost Tricare, the United States military's health care plan, more than $11 million in losses. (See CR 19-195-ODW, Dkt. 388.) In United States v. David Morrow, a cosmetic surgeon was sentenced to 20 years in prison related to medically unnecessary cosmetic procedures billed for more than $44 million. (See CR 15-99-JLS, Dkt. 206.) In United States v. Artak Ovsepian, et al., a medical clinic employee was convicted at trial and sentenced to 15 years for a $20 million scheme to defraud Medicare and Medi-Cal related to fraudulently prescribed anti-psychotic medications. (See CR 11-1075-VAP, Dkt. 1021.) The

recommended sentence is also consistent, in particular, with sentences for defendants convicted at trial of fraud involving DME.  (See United States v. Uben Rush, CR 09-679-GHK (owner of six DME companies that submitted more than $15 million in fraudulent claims for power wheelchairs, among other DME, convicted at trial and sentenced to 13 years in prison).

Although the co-defendants in this case – office manager Cynthia Marquez and repair technician Juan Murillo – received much shorter sentences (time served and probation, respectively), they accepted responsibility for their actions, were convicted of fewer crimes, and had smaller roles receiving much less benefit from the fraud.  (See CR 313 (Marquez); CR 287 (Murillo).)  Thus, they are not similarly situated for the purposes of 3553(a)(6) and their sentences do not necessarily dictate what defendant's sentence should be.  See Treadwell, 593 F.3d at 1013 (district court did not abuse its discretion, including in finding co-defendant's decision to plead guilty warranted sentencing disparity).  Moreover, "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case," meaning that the examples of sentences in the similar health care fraud cases discussed above are a more appropriate benchmark and support the government's requested sentence.  United States v. Saeteurn, 504 F.3d 1175, 1181 (9th Cir. 2007).

Finally, while the prior sentencing court disagreed with the government and Probation Office's recommendations for the co-defendants' sentences, (see CR 204 at 5 (government's position agreeing with the Probation Officer on a 63-month low-end Guidelines sentence for Marquez); CR 193 at 5 (government's position agreeing with the Probation Officer on a 37-month low-end Guidelines sentence for Murillo)), the sentences imposed for the co-defendants appeared to have been based primarily on the grounds that defendant was the true architect of the fraud and should thus receive by far the greatest sentence for it.  The government's recommendation takes that greater role and benefit into account, while nonetheless having the effect of moderating to some extent the difference between the sentencing outcomes in this particular case.

14

### D. The Remaining Section 3553(a) Factors Also Support the Requested Sentence

Section 3553 (a)(3) requires the Court to consider the kinds of sentences available. Given the nature of defendant's offense, any sentence that does not involve some period in custody would not be appropriate here. In addition, defendant's crime falls within Zone D of the Sentencing Table, and non-custodial sentences are discouraged for such offenses. See U.S.S.G. § 5C1.1(f); U.S.S.G. § 5B1.1 cmt. n.2. Furthermore, the public interest in satisfying the other Section 3553(a) factors of obtaining a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from further crimes of defendant outweighs any interest in having defendant avoid time in custody.

Sections 3553(a)(4) and (5) require the Court to treat the Guidelines as merely "advisory" but to take them into consideration nonetheless, as the government has done herein and as the Probation Officer did in the PSR.

Finally, under 18 U.S.C. § 3553(a)(7), the Court is required to consider the need to provide restitution to the victims of the offense. The government agrees with the USPO that that the Court should order defendant to pay restitution of $13,107,422.80, which represents the actual losses of Medicare and Medi-Cal from defendant's scheme.

## V. CONCLUSION

For the foregoing reasons, the government respectfully submits that the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a) support the imposition of a sentence that includes a 180-month term of imprisonment, a three-year period of supervised release and conditions, payment of a $2,300 special assessment, and payment of restitution in the amount of $13,107,422.80.

# DECLARATION OF KRISTEN A. WILLIAMS

I, Kristen A. Williams, state and declare as follows:

1. I am an Assistant United States Attorney ("AUSA") for the Central District of California and am one of the attorneys assigned to the prosecution of <u>United States v. Tamara Yvonne Motley, et al.</u>, CR No. 17-00774-FMO. I make this declaration in support of the Government's Response to the Presentence Report and Sentencing Position re Defendant Tamara Yvonne Motley.

2. Attached hereto as Exhibits A and C are true and correct redacted copies of reports of interview with Ausie Motley regarding AM Medical Distributors, Inc. ("AM Medical") and John Motley regarding Trey Medical Distributors, Inc. ("Trey"), respectively.

3. Attached hereto as Exhibits B, D, and G, are true and correct excerpts from Medicare claims information obtained during the course of the investigation regarding AM Medical, Trey, and Smitty Medical Supply, Inc. ("Smitty"), respectively.

4. Attached hereto as Exhibit E is a true and correct redacted copy of a document obtained during the search of Action regarding Trey.

5. Attached hereto as Exhibit F is a true and correct copy of an initial filing by Smitty with the California Secretary of State.

6. Based on my review of the report of an August 2013 interview of Dulce Anguiano, I am informed and believed that she told agents she previously worked for defendant Motley at Smitty.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief and that this declaration was executed on October 24, 2023, in Los Angeles, California.

_____
KRISTEN A. WILLIAMS

16